IN RE APPLICATION OF CVAMMEN.

**[Cite as *In re Application of Cvammen,*
102 Ohio St.3d 13, 2004-Ohio-1584.]**

(No. 2003–1366—Submitted October 20, 2003—Decided April 14, 2004.)

**Per Curiam.**

{¶ 1} Applicant, Bradford Scott Cvammen of Akron, Ohio, filed an application on August 15, 2002, to register as a candidate for admission to the practice of law in Ohio. On December 17, 2002, members of the Akron Bar Association Admissions Committee interviewed applicant as part of the review process to determine whether he possessed the requisite character, fitness, and moral qualifications for admission to the Ohio bar. Gov.Bar R. I(11)(C) and (D). The interviewers recommended that applicant's candidacy be disapproved temporarily because he had not fully and truthfully answered questions about the circumstances surrounding his forced resignation from employment with a real estate company. In reporting to the Board of Commissioners on Character and Fitness, the admissions committee also recommended that respondent's candidacy be disapproved.

{¶ 2} Respondent appealed from the committee's recommendation pursuant to Gov.Bar R. I(12)(B). A panel appointed by the board heard the appeal on May 6, 2003.[1] Evidence presented established, for the purpose of this proceeding, the following facts.

{¶ 3} Appellant graduated in the spring of 2003 from the University of Akron School of Law and applied to take the July 2003 bar examination. During law

---

1. The parties agreed to review by only two of the three panel members appointed to hear the cause.

school, he worked full-time for a commercial real estate company that leased property to tenants in shopping centers and warehouse distribution districts. Applicant began working for his employer in 1994 as a property manager, advancing quickly over the years to eventually become the director of the company's retail properties.

{¶ 4} As the director of retail properties, applicant showed space for lease to prospective tenants, managed building operations and construction projects, negotiated lease agreements, evaluated improvements, and developed rental space plans. He enjoyed considerable autonomy in his position but also reported almost daily to his supervisor, the president of the company.

{¶ 5} In the course of this employment, applicant leased contiguous space in a shopping center to two retail tenants: one an Arabica Coffeehouse franchisee, the other a Heavenly Ham franchisee. The owner of the Arabica Coffeehouse eventually decided to sell his business and thus wanted to get out of his lease. Because applicant's employer encouraged him to work with tenants in this situation,[2] he contacted the owner of the Heavenly Ham store in or around June 2000 and inquired whether the owner would be interested in taking an assignment of the lease of the coffeehouse space. The two tenants consented to this arrangement and negotiated an assignment. Afterward, the Arabica Coffeehouse tenant paid respondent $5,000 for his assistance. Respondent kept this money and did not disclose the payment to his employer. He also did not report the $5,000 payment as income on his 2000 tax return in April 2001.

{¶ 6} Over the next year, the Heavenly Ham store tenant defaulted on his original lease and the assigned lease. In July 2001, the real estate company brought an eviction action and also sued both tenants for unpaid rent. With the lawsuit looming, the Arabica Coffeehouse tenant contacted applicant and, after they discussed the situation, applicant became concerned that the $5,000 payment would be exposed during the litigation. Applicant subsequently disclosed the $5,000 payment to his employer, and his employer, after discussions among the board of directors and officers, asked for his resignation. In November 2001, applicant tendered his resignation.

{¶ 7} In completing his bar application the next year, applicant was asked to provide the "full particulars as to the reasons" for which he was asked to resign from his job. Applicant related that he had been asked to resign by the real estate company after he had "earned a sum of money for finding a buyer" for one of the company's tenants. He gave the impression that no company policy

---

2. A lessor has a duty to mitigate damages, as is reasonable under the circumstances, caused by a lessee's breach of a commercial lease. *Frenchtown Square Partnership v. Lemstone, Inc.*, 99 Ohio St.3d 254, 2003-Ohio-3648, 791 N.E.2d 417, syllabus.

prevented this practice and that it was not "uncustomary in the industry." He also described the reason for his resignation as the "political" decision of a major shareholder and board member who, according to applicant, had forced him out while telling the remaining board members that he had quit to pursue his education full-time.

{¶ 8} When applicant appeared for his character interview in December 2002, his interviewers confronted him about the resignation. Applicant revealed the additional facts that the tenant had paid him $5,000, that he had accepted this money without telling his employer, and that he had not reported the payment as taxable income. According to one interviewer, applicant's excuse for not reporting the income was that "the tenant hadn't given him a 1099 [reporting form], so the IRS would never know."

{¶ 9} During the panel hearing, applicant presented three character references and his own testimony. Judge Brenda Unruh of the Summit County Court of Common Pleas, who had known applicant socially for approximately one and one-half years prior to the hearing, assured the panel of his integrity. She also described a telephone conversation they had had after he received notice of the committee's disapproval. Judge Unruh attested that while applicant had initially insisted that his forced resignation was political, or personal in nature, he began to realize the impropriety of his conduct after they discussed further the conflict of interest and deceit in which he had engaged. The judge added that in interactions after this discussion, applicant consistently acted in a manner demonstrating his contrition, his having accepted responsibility for his mistakes, and his commitment never to repeat those improprieties.

{¶ 10} Applicant's other references were the real estate company's president and vice-president. The president, a mentor of applicant's who had opposed his forced resignation, also assured the panel of applicant's high moral and ethical character. The president testified that although applicant accepted the $5,000 payment, concealed it, and did not report it as income, the president was convinced that applicant had since appreciated the wrongfulness of his conduct and had learned a valuable lesson from these mistakes. The vice-president, it was agreed, would have testified that he, too, was aware of the events surrounding applicant's resignation, including his failure to report income. Notwithstanding this, the vice-president still recommended applicant's character and moral fiber, believing that the incident had been an "eye-opening" experience for him.

{¶ 11} For his part, applicant testified on direct examination to the facts of the $5,000 secret side deal and his subsequent failure to report this income. He emotionally conceded his wrongdoing, apologized, and promised never to repeat his transgressions. Applicant also proved that after he had received notice of his

disapproval, he amended his tax returns to declare the $5,000 payment and paid the applicable taxes and penalties.

{¶ 12} After the panel considered all of the foregoing evidence, it remained troubled, as had been the admissions committee, about applicant's ability to tell the truth. The panel concluded that applicant's bar application responses, interview answers, and testimony did not comport with other witnesses' testimony at the hearing, adding that he often contradicted himself. In describing its assessment of applicant's credibility, the panel observed:

{¶ 13} "While stating that he did wrong, Applicant's words, manner and demeanor continue to indicate that he really doesn't accept responsibility [for his wrongdoing]; it is more a matter that, having been caught, he is now sorry that he did something that is standing in the way of his becoming a lawyer. He continues to try to explain away his actions which inevitably leads to inconsistencies in his testimony and in the appearance he makes."

{¶ 14} The panel recommended, in effect, that respondent's application to register as a candidate for admission to the Ohio bar be disapproved but that he be permitted to reapply in anticipation of taking the February 2004 bar examination. The board adopted the panel's findings but modified its recommendation. The board recommended, in effect, that respondent's application be disapproved but that he be permitted to reapply for admission in anticipation of taking the February 2005 bar exam.

{¶ 15} We concur in the panel's findings, as adopted by the board, that applicant has not established his character and fitness as required for admission to the Ohio bar. We do not, however, accept the premise that he may acquire these moral qualifications in the future and that his bar application should be merely postponed. Instead, because applicant has consistently exhibited duplicitous behavior, we are convinced that he must be permanently denied the privilege of applying for admission to the practice of law in this state.

{¶ 16} "The paramount concern in proceedings before the Board of Commissioners on Character and Fitness is whether the applicant possesses those moral traits of honesty and integrity which will enable him to fully and faithfully discharge the duties of our demanding profession. We view such proceedings as being different from the adversary contest associated with, for example, disciplinary cases. A hearing to determine character and fitness should be more of a mutual inquiry for the purpose of acquainting this court with the applicant's innermost feelings and personal views on those aspects of morality, attention to duty, forthrightness and self-restraint which are usually associated with the accepted definition of 'good moral character.' " *In re Application of Davis* (1974), 38 Ohio St.2d 273, 274, 67 O.O.2d 344, 313 N.E.2d 363.

{¶ 17} *In re Application of Davis* criticized an applicant's reliance on the attorney-client privilege to keep damaging yet salient character information concerning his prior felony conviction from the board. Because the board's sole function is to "fully determine all the facts which can logically reflect upon the wisdom of admitting an applicant with a questionable background to the practice of law," we held that the board's review commanded "the utmost in cooperation between the applicant and the board, and [left] little room for the employment of doctrines which work to keep relevant information from the board." Id, 38 Ohio St.2d at 274–275, 67 O.O.2d 344, 313 N.E.2d 363. The same rule applies here. An applicant's complete and impeccably honest report is required for any information that possibly reflects on the applicant's moral fiber and fitness to fulfill the position of trust in which an attorney is placed by clients.

{¶ 18} That applicant defied this duty throughout the admissions process was made abundantly clear by testimony before the panel. Applicant gave the impression on his bar application that side deals were customary in real estate; however, the real estate company president testified that taking money "under the table" was not an accepted practice in his business. After persistent questioning, even applicant conceded that side deals were "probably more customary for a real estate agent" than for someone in his position as an in-house leasing agent. Applicant testified inconsistently about precisely when he realized the impropriety of taking the $5,000 payment and his failure to report it as income. Initially, he presented Judge Unruh's testimony that he had fully realized the extent of his wrongdoing only after consulting her. On cross-examination, however, applicant conceded that he had earlier acknowledged his improprieties and expressed his remorse to his interviewers, an exchange that was also marked by his emotional promises to "do better." And when asked whether he realized that he had not reported the $5,000 as income after his November 2001 termination, applicant testified first that he "inherently knew" but later that this realization did not "dawn" on him until "closer" to his December 2002 interview. Moreover, in response to intense inquiries from the panel, applicant revealed for the first time that the Arabica Coffeehouse tenant had originally offered him $10,000 for what he claimed to have been no more than his help in finding an assignee of the lease.

{¶ 19} Equally disturbing is applicant's inability to settle on the reason that he had failed to report the $5,000 payment as income. Applicant testified that he had initially forgotten about the payment in filing his taxes. He also testified that he had not known whether he had had to report the payment, implying that he might have considered the money a gift rather than earned income. Either way, it is patently clear from applicant's testimony that he lied to his interviewers about why he had not reported the payment for tax purposes. In response to additional probing by the panel, respondent ultimately admitted that the explana-

tion he had provided during his interview—that he did not report the income because he had not received a 1099 form—"didn't have anything to do with it."

{¶ 20} Hedging and inconsistencies were the standard as applicant attempted to establish his character and fitness. His testimony revealed a propensity to conceal actions—his acceptance of the $5,000 secret payment and failure to report it as income—which he knew to be wrong. He was also caught having told at least one unmitigated lie.

{¶ 21} Applicant's false or incomplete answers on his application and in his interview and his continued attempts to avoid the truth in his testimony confirm for us what the panel and board surmised—that the applicant lacks integrity. As the panel and board found, applicant knew that his receipt of the $5,000 payment was wrong, he disclosed the payment only because he feared exposure, he compounded his deceit by deliberately failing to report the payment as income, and he then attempted to conceal the extent of his wrongdoing through evasive responses to legitimate questions.

{¶ 22} Evidence of false statements, including material omissions, and lack of candor in the admissions process reflect poorly on an applicant's character, fitness, and moral qualifications. *In re Application of Panepinto* (1999), 84 Ohio St.3d 397, 704 N.E.2d 564. Where, as here, these ethical infractions so permeate the admissions process that the applicant's honesty and integrity are shown to be intrinsically suspect, our disposition must be to permanently deny his application to register as a candidate for admission to the Ohio bar. Accordingly, applicant is permanently denied admission to the practice of law in Ohio.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY and O'CONNOR, JJ., concur.

PFEIFER, LUNDBERG STRATTON and O'DONNELL, JJ., dissent.

---

**LUNDBERG STRATTON, J., dissenting.**

{¶ 23} I dissent from the majority's opinion. I would permit the applicant to register as a candidate for admission in anticipation of taking the February 2005 bar exam. A permanent refusal is the equivalent of a disbarment. Had the respondent committed similar acts after becoming an attorney, we would have given him at most an indefinite suspension and permitted him later to demonstrate that he had rehabilitated himself before rejoining the bar. In this case, there was no theft involved and no clients harmed although the conduct involved dishonesty. While I do not condone his behavior, I believe it was such that respondent ought to be given a chance to rehabilitate himself and then be permitted to apply again for admission to the bar.

{¶ 24} Therefore, I respectfully dissent.

PFEIFER and O'DONNELL, JJ., concur in the foregoing dissenting opinion.

---

Robert C. Baker, for applicant.

Kim R. Hoover, for Akron Bar Association.