IN RE APPLICATION OF ABOYADE.

[Cite as *In re Application of Aboyade*,
103 Ohio St.3d 318, 2004-Ohio-4773.]

(No. 2003–1367—Submitted May 11, 2004—Decided September 22, 2004.)

## Per Curiam.

{¶ 1} Applicant, Kimberli Christine Aboyade, was born December 9, 1971, in Pittsburgh, Pennsylvania. She obtained a law degree from the University of South Carolina in May 1999 and was subsequently admitted to the practice of law in South Carolina.

{¶ 2} On March 1, 2001, applicant filed an Application to Register as a Candidate for Admission to the Practice of Law in Ohio. On March 21, 2001, she applied to take the Ohio bar examination. On June 15, 2001, members of the Columbus Bar Association's admissions committee interviewed applicant, and on June 20, 2001, the committee approved of her character, fitness, and moral qualifications for admission to the practice of law in Ohio. Gov.Bar R. I(11)(D)(2). Applicant took the July 2001 bar examination and, by letter dated November 1, 2001, received confirmation of having passed. Applicant was never administered the oath, however, because this court did not receive certification of applicant's passing score on the Multistate Professional Responsibility Examination.

{¶ 3} During the bar application process, applicant accepted employment with Squire, Sanders, & Dempsey, L.L.P., and began work in Columbus for that law firm on February 12, 2001. According to the law firm's employment records, applicant was discharged on November 2, 2001, for poor job performance. In addition, an internal memorandum composed by a co-worker recounted applicant's strange behavior after the events of Tuesday, September 11, 2001.

{¶ 4} According to the memorandum, applicant had represented to co-workers on that Tuesday that she had a good friend who had been working in the World Trade Center and that authorities could not account for this person after the collapse. Applicant also indicated that she had two unaccounted-for relatives who may have been on targeted flights. Applicant told the co-worker that after she finished some work, she was going to drive to New York.

{¶ 5} Several days later, on Friday, September 14, 2001, applicant called the co-worker to say that she had returned to her apartment in Columbus and was able to return to work. Applicant reported that she had driven to Virginia to pick up her friend's mother and then driven to New York City so that her friend's mother could identify the remains. Applicant said that the mother had viewed the remains, but they were not those of her daughter, and applicant had driven her friend's mother back to Virginia. Applicant also mentioned that her prior employer, Weil, Gotschal & Manges, L.L.P., of New York City, had arranged to

transport applicant and her friend's mother into Manhattan by helicopter. The co-worker told applicant that she need not return to work right away.

{¶ 6} By the following week, elements of applicant's story had aroused her co-worker's suspicions. The claim that the friend's mother had immediately left New York City, rather than staying to try and find her daughter, seemed implausible to him. The co-worker also doubted that applicant could have driven from Columbus to Virginia to New York City and back in the amount of time that she claimed. In addition, a very long voice mail that applicant had left while she was supposedly in the car driving back to Columbus had not sounded to the co-worker as though applicant was actually in a car at all. And in later describing to the co-worker a New York hospital where she claimed to have witnessed burn victims left in hallways due to the "chaos," the co-worker thought it odd that applicant could not remember the hospital's name. Also, by the time of their conversation, only a few dozen people had actually been hospitalized in New York City. Moreover, the co-worker had been unable to find the name of applicant's friend among the victims identified on a website providing this information. Finally, it was discovered that applicant had used her office computer during the time that she claimed to have been in New York City.

{¶ 7} The law firm threatened applicant with dismissal unless she corroborated the reasons for her absence with a letter from her friend's employer verifying the injuries the friend had sustained on September 11, 2001, the medical treatment the friend had received, and her friend's consent to the release of this information. Applicant promised to verify her whereabouts. She later reported to the law firm that she was in Pennsylvania to care for an ill grandparent and claimed that the requested documentation was being held with her other mail at the post office. The law firm ultimately dismissed applicant, effective November 15, 2001, because she did not explain her disappearance.

{¶ 8} One month later, in December 2001, the Pittsburgh office of Jones Day interviewed applicant and offered her employment. She accepted and joined that law firm as an associate in January 2002. As part of her application, applicant submitted a transcript of what she claimed were her grades in law school. In the first week of March 2002, however, her new employer obtained applicant's official transcript from the University of South Carolina Law School and noticed startling discrepancies. Applicant's submission had been "altered to reflect materially enhanced academic performance." Applicant later admitted that she had fabricated the copy of her law school transcript that she gave to Jones Day. Applicant is no longer employed at that law firm.

{¶ 9} An associate of Jones Day reported this incident to Ohio's Disciplinary Counsel, who reported it to the Board of Commissioners on Character and Fitness. The board invoked its investigatory authority pursuant to Gov.Bar R.

I(10)(B)(2)(e) and appointed a panel of the board to hear the cause. On December 19, 2002, after a January 10, 2003 hearing date was set, applicant asked to withdraw her application to the Ohio bar. In explanation, applicant related that she had lived in Ohio for only several months during 2001, she had since relocated to Pennsylvania, and she did not intend to return to Ohio. Applicant further explained that she was considering career alternatives due to the stress of an ongoing investigation into her fitness to practice law in South Carolina.

{¶ 10} The panel hearing was continued pending the board's decision on applicant's request to withdraw her application. On February 14, 2003, the board denied the request for withdrawal. The next month, the panel learned that applicant had been disbarred in South Carolina on March 24, 2003, for having falsified her law school transcripts and provided false testimony under oath. According to the South Carolina Supreme Court, applicant had changed the Cs that she had received in 12 courses to As or Bs and changed her grade point average from 2.96 to 3.505. *In re Aboyade* (2003), 353 S.C. 488, 578 S.E.2d 727. The court found that applicant had then submitted copies of the falsified transcript to law firms, which relied on the transcripts in deciding to offer her employment. The court further found that applicant had submitted a false affidavit in response to inquiries of South Carolina's Disciplinary Counsel and testified falsely under oath during that disciplinary process.

{¶ 11} After denial of the request to withdraw her application, applicant had no further contact with the panel or the Office of Bar Admissions. She also did not appear at the July 11, 2003 panel hearing.

{¶ 12} The panel found that applicant had failed to sustain her burden of proving by clear and convincing evidence that she has the character, fitness, and moral qualifications to practice law in Ohio. Gov.Bar R. I(11)(D)(1). Finding the facts as stated above, the panel determined that applicant had "failed to provide complete and accurate information concerning her past," "made false statements, including omissions," "engaged in acts involving dishonesty, fraud, deceit, or misrepresentation," and "been subject to disciplinary action by a professional disciplinary agency of another jurisdiction, i.e., disbarment by the Supreme Court of South Carolina." Gov.Bar R. I(11)(D)(3)(g), (h), (i), and (o). As further evidence of her failure to provide required information, the panel observed that applicant had failed to update her application to take the Ohio bar, as required by Gov.Bar R. I(3)(F), and report her employment with Jones Day on her supplemental character and fitness application.

{¶ 13} The panel recommended that applicant's candidacy for admission to the Ohio bar be denied and that she be forever barred from admission to the practice of law in this state. The panel concluded:

{¶ 14} "[Applicant] has been dishonest with her transcript, her employers * * *, and the Supreme Court of South Carolina. Honesty is one of the basic and most important characteristics needed by a lawyer. [Applicant] has repeatedly demonstrated she completely lacks any shred of honesty. There is nothing * * * to show she has made any effort to change or to commence being truthful."

{¶ 15} The board adopted the panel's report, including the findings of fact and recommendation to permanently deny applicant's candidacy for admission to the Ohio bar.

{¶ 16} Upon review, we agree that applicant has failed to prove her qualifications as required. An applicant whose honesty and integrity are intrinsically suspect cannot be admitted to the Ohio bar. *In re Application of Cvammen,* 102 Ohio St.3d 13, 2004–Ohio–1584, 806 N.E.2d 498, ¶ 22. Accordingly, respondent is hereby permanently denied admission to the practice of law in Ohio.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

---

Bloomfield & Kempf and David S. Bloomfield, for Columbus Bar Association.